PD-0476-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/1/2015 9:50:53 PM
Accepted 6/2/2015 3:18:12 PM
ABEL ACOSTA
CLERK

No. PD-0476-15
No. PD-0477-15
In the
Court of Criminal Appeals
At Austin

———————◆———————

No. 01-13-00990-CR
No. 01-13-00991-CR

In the
Court of Appeals
for the
First District of Texas
at Houston

———————◆———————

No. 1315239
No. 1315240
In the 176th District Court
Harris County, Texas

———————◆———————

# JOSE FRANCO CAMPUZANO
*Appellant*
V.
# THE STATE OF TEXAS
*Appellee*

———————◆———————

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

FILED IN
COURT OF CRIMINAL APPEALS

June 2, 2015

ABEL ACOSTA, CLERK

MANDY MILLER
Attorney for Jose Franco Campuzano
State Bar No: 24055561
2910 Commercial Ctr. Blvd., Ste. 103-201
Katy, TX 77494
(832) 900-9884
Fax: (877) 904-6846
mandy@mandymillerlegal.com

ORAL ARGUMENT REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 68.4(d), appellant requests oral argument. The First Court of Appeals erred when it failed to hold that the trial court abused its discretion when it cumulated appellant's suspended sentence with his prison sentence. As evidenced by case law and legislative history, § 3.03 of the Texas Penal Code prohibits the cumulation of a suspended sentence and a term of prison.

Additionally, the First Court of Appeals misapplied the ruling announced in *Sanders v. State* when it found that trial counsel failed to preserve the motion to suppress appellant's warrantless blood draw for appellate review. Although the trial court denied the motion after evidence regarding the motion was admitted, the court indicated to trial counsel that it would refrain from ruling on the motion until the court had more information.

Finally, the First Court of Appeals erred in holding that trial counsel's performance did not fall below an objective standard of reasonableness for failing to challenge Texas' implied consent statute in light of *Missouri v. McNeely*. *McNeely* announced that there are no *per se* exceptions to the requirement of a warrant and the appellate court failed to recognize that this was the state of the law in effect when appellant's cases were tried.

The issues raised in this petition are fact specific and concern new areas of United States Supreme Court precedent. Oral argument will aide this Court in answering any questions which may arise.

# IDENTIFICATION OF THE PARTIES

Pursuant to TEX. R. APP. P. 68.4(a), a complete list of the names of all interested parties is provided below.

Counsel for the State:
1201 Franklin, Ste. 600
Houston, TX 77022

**Devon Anderson** — District Attorney of Harris County

**Melissa Hervey** — Assistant District Attorney on appeal

**Lauren Bard and Janna Oswald** — Assistant District Attorneys at trial

Appellant or criminal defendant:

**Jose Franco Campuzano**

Counsel for Appellant:

**Robin E. Mitchell** — Counsel at trial
1117 Herkimer St.
Houston, TX 77008

**Mandy Miller** — Counsel on appeal
2910 Commercial Center Blvd, Ste. 103-201
Katy, TX 77494

Trial Judge: **Hon. Stacey W. Bond**

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT................................................................ i

IDENTIFICATION OF THE PARTIES............................................................................... iii

TABLE OF CONTENTS ................................................................................................... iv

INDEX OF AUTHORITIES .............................................................................................. v

STATEMENT OF THE CASE............................................................................................ 1

GROUNDS FOR REVIEW ................................................................................................ 2

    Did the First Court of Appeals err when it failed to find that the trial court did not abuse its discretion when the court cumulated a suspended sentence on top of a prison sentence? ...................................................................................................................... 2

    Did the First Court of Appeals misapply the ruling in Sanders v. State to this case when it found that the trial lawyer did not preserve error be failing to get a ruling on his motion to suppress until after the evidence was admitted? .......................... 4

    Was *Missouri v. McNeely* v. the "state of the law in effect" when the defendant was tried? If so, did the First Court of Appeals err when it refused to find trial counsel ineffective for failing to challenge the constitutionality of Texas' implied consent statute? ..................................................................................................................... 7

CONCLUSION ................................................................................................................. 9

CERTIFICATE OF COMPLIANCE ................................................................................. 9

CERTIFICATE OF SERVICE........................................................................................... 10

# INDEX OF AUTHORITIES

## CASES

*Campuzano v. State,*
No. 01-13-00990-CR, 2015 WL 1468304 (Tex. App.--Houston
[1st Dist.] Mar. 26, 2015, pet. filed) (not designated for publication) .................. 1, 5, 7

*Ex parte Chandler,*
182 S.W.3d 350 (Tex. Crim. App. 2005) ................................................ 8

*Gore v. State,*
451 S.W.3d 182 (Tex. App.--Houston [1st Dist.] 2014, pet. filed) .............................. 8

*Green v. State,*
706 S.W.2d 653 (Tex. Crim. App. 1986) ................................................ 3

*Ivey v. State,*
277 S.W.3d 43 (Tex. Crim. App. 2009) ................................................ 3

*Mireles v. State,*
444 S.W.3d 679 (Tex. App.--Houston [14th Dist.] 2014, pet. denied) ...................... 2

*Missouri v. McNeely,*
___ U.S. ___, 133 S.Ct. 1552 (2013) ................................................ 5

*Sanders v. State,*
387 S.W.3d 680 (Tex. App.--Texarkana 2012, pet. struck) ................................ 5

*Speth v. State,*
6 S.W.3d 530 (Tex. Crim. App. 1999) ................................................ 4

*State v. Guzman,*
959 S.W.2d 631 (Tex. Crim. App. 1998) ................................................ 8

*Weems v. State,*
434 S.W.3d 655 (Tex. App.--San Antonio 2014, pet. granted) .......................... 8

## STATUTES

TEX. CODE CRIM. P. ANN. art. 42.08 (Vernon 1979)..................................................3

TEX. CODE CRIM. P. ANN. art. 42.08 (Vernon 1987)..................................................3

TEX. CODE CRIM. P. ANN. art. 42.08 (West Supp. 2013) ...........................................3

TEX. CODE CRIM. P. ANN. art. 42.12 § 2(B) (West Supp. 2013)................................4

TEX. PEN. CODE ANN. § 3.03(a)(b) (West Supp. 2013)...........................................3

## RULES

TEX. R. APP. P. 38.2(a)(1)(A) ......................................................................................iii

TEX. R. APP. P. 39.7........................................................................................................i

TEX. R. APP. P. 68.2(c) ..................................................................................................2

## TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:

### STATEMENT OF THE CASE

Appellant was charged by indictment with intoxication manslaughter and intoxication assault. (CR I[1] 13; CR II 13). A jury convicted appellant of intoxication manslaughter and sentenced him to 15 years confinement in the Institutional Division of the Texas Department of Criminal Justice. (CR I 155). Appellant was also convicted of intoxication assault and sentenced to 5 years confinement in the Institutional Division of the Texas Department of Criminal Justice. (CR II 198). That sentence was suspended and appellant was placed on community supervision for five years. (CR II 198). The court cumulated the sentences, requiring appellant to begin serving the suspended sentence after he completes his prison sentence. (RR VIII 90).

### STATEMENT OF THE PROCEDURAL HISTORY

On March 26, 2015, a unanimous panel of the First Court of Appeals issued an unpublished opinion affirming appellant's convictions for intoxication manslaughter and intoxication assault. *Campuzano v. State*, No. 01-13-00990-CR, 2015 WL 1468304 (Tex. App.--Houston [1st Dist.] Mar. 26, 2015, pet. filed) (not designated for publication) (Appendix A). No motion for rehearing was filed. This petition was originally due on May 27, 2015. Due to unforeseen circumstances, appellant

requested a short extension, until June 2, 2015, to file this petition. At the time of filing, the Court had not ruled on appellant's motion.

## GROUNDS FOR REVIEW

**Did the First Court of Appeals err when it failed to find that the trial court did not abuse its discretion when the court cumulated a suspended sentence on top of a prison sentence?**

After finding him guilty of both charged offenses, the jury assessed appellant's punishment at confinement for fifteen years for the offense of intoxication manslaughter. (CR I 155). For the offense of intoxication assault, the jury assessed his punishment at confinement for five years, suspended the sentence, and placed him on community supervision for five years. (CR II 198). The trial court then ordered that the sentences run consecutively, with appellant serving his sentence of confinement first, followed by his period of community supervision. (RR VIII 90).

Relying on the recent opinion in *Mireles v. State*[2], the First Court of Appeals held that the trial court did not abuse its discretion in cumulating the sentences. In *Mireles*, the appellate court noted that there is no case law that expressly states § 3.03 of the Texas Penal Code does not apply to suspended sentences. *Id.* at 683.

Article 42.08 of the Texas Code of Criminal Procedure provides that, if a defendant is convicted in two or more cases, the "sentence imposed or suspended" in

---

[1] The clerk's record in cause number 1315239 will be referred to as "CR I." The clerk's record in cause number 1315240 will be referred to as "CR II."
[2] 444 S.W.3d 679 (Tex. App.--Houston [14th Dist.] 2014, pet. denied)

the second conviction may run either consecutively or concurrently with the first sentence. TEX. CODE CRIM. PROC. ANN. art. 42.08 (West Supp. 2013). § 3.03 states that "sentences" for intoxication manslaughter and intoxication assault, arising out of the same criminal episode, may run either concurrently or consecutively. TEX. PEN. CODE ANN. § 3.03(a)(b) (West Supp. 2013). By its plain language, § 3.03 applies only to "sentences," whereas article 42.08 applies to a "sentence imposed or suspended."

Prior to 1987, article 42.08 only permitted trial courts to stack the "punishment assessed." TEX. CODE CRIM. PROC. ANN. art. 42.08 (Vernon 1979). In *Green v. State*, the Court of Criminal Appeals construed this language narrowly when it held that "punishment assessed" did not include community supervision, and that the trial court did not have the authority, under the statute, to stack a suspended sentence with a prison sentence. 706 S.W.2d 653, 657-58 (Tex. Crim. App. 1986). In response, the legislature amended article 42.08 and completely eliminated the phrase "punishment assessed" and replaced the references to punishment with "sentence imposed or suspended." TEX. CODE CRIM. PROC. ANN. art. 42.08 (Vernon 1987). This change evidences the legislature's clear intent that "sentence imposed" and "sentence suspended" have separate meanings.

It must be presumed that when the legislature omits wording from a statute, it was done so intentionally. *Ivey v. State*, 277 S.W.3d 43, 57 (Tex. Crim. App. 2009). Like pre-1987 versions of article 42.08, § 3.03 of the Penal Code does not contain "sentence imposed or suspended" language. It only authorizes the cumulation of

3

"sentences." The initial version of § 3.03 was effective in 1974. It was subsequently amended several times since then. At no point did the legislature see fit to include "sentence imposed or suspended," despite having article 42.08 to guide them. Thus § 3.03 applies to only sentences imposed and not suspended sentences.

When a sentence is suspended and the defendant is placed on community supervision, the term of community supervision is not considered a sentence. Community supervision is defined by the Code of Criminal Procedure as involving a suspension of the sentence. TEX. CODE CRIM. P. ANN. art. 42.12 § 2(B) (West Supp. 2013). "[C]ommunity supervision is an arrangement in lieu of the sentence, not as part of the sentence." *Speth v. State*, 6 S.W.3d 530, 532 (Tex. Crim. App. 1999).

The First Court of Appeals erred in finding that the trial court did not abuse its discretion in cumulating appellant's sentences because there is no case law stating that § 3.03 only applies to prison sentences. The jurisprudence and legislative history evidences the legislature's intent that a suspended sentence not be cumulated with a prison sentence.

**Did the First Court of Appeals misapply the ruling in *Sanders v. State*[3] to this case when it found that the trial lawyer did not preserve error be failing to get a ruling on his motion to suppress until after the evidence was admitted?**

Appellant and Javier Macias, childhood friends, went out drinking one evening. (RR VI 26, 27; RR VII 6, 13). By 2:00 a.m. the following day, both men were seriously injured as a result of a car accident. Daniel Padilla, the driver of another vehicle, was

4

killed. At the request of law enforcement, appellant's blood was taken by hospital personnel. (RR V 157). Law enforcement made no attempt to get a search warrant for the blood, instead relying on §§ 724.011 and 724.014 of the Texas Transportation Code to authorize the warrantless blood draw. (RR V 225).

Prior to trial, appellant filed a motion to suppress, alleging that the warrantless taking of appellant's blood violated appellant's Fourth Amendment rights, as recognized in the United States Supreme Court ruling in *Missouri v. McNeely*[4]. (CR I 109-111; CR II 59-62). The trial court conducted a short pre-trial hearing on the motion, but chose to take the issue under advisement after hearing the relevant testimony. (RR II 11-15; Appendix B). During trial, testimony was admitted regarding the circumstances of the blood draw the ensuing results. (RR V 243-248; Appendix C). Immediately after, the trial court denied appellant's motion to suppress. (RR V 248; Appendix C).

On appeal, appellant alleged that the trial court erred in denying his motion to suppress. The appellate court, relying on *Sanders*, ruled that appellant failed to preserve error by not obtaining a ruling on his motion before testimony relevant to the motion was admitted before the jury. *Campuzano*, 2015 WL 1468304, at *6.

In *Sanders*, trial counsel filed a handwritten motion to suppress "any and all evidence in this case." *Sanders*, 387 S.W.3d at 686. The court decided to "carry [the

---

[3] 387 S.W.3d 680, 686 (Tex. App.--Texarkana 2012, pet. struck).
[4] ___ U.S. ___, 133 S.Ct. 1552 (2013)

5

motion] to trial." *Id.* There was no hearing on the motion to suppress when trial began the following day, and the court gave no further instructions to trial counsel regarding a ruling on the motion. *Id.*

A witness testified regarding the discovery of evidence and told the jury that Sanders had spit on him, all without objection. *Id.* After presentation of this evidence, Sanders' counsel asked the court to hear the motion to suppress and argued that the witness "'had no reasonable suspicion or probable cause to arrest the defendant or to seize him and throw him over the police car and handcuff him and search him as he did.'" *Id.* The trial court denied the motion. *Id.*

Sanders challenged the trial court's denial of the motion to suppress on appeal. *Id.* at 685. The appellate court held that Sanders failed to preserve any error for review. *Id.* at 686. "Because the trial court had not instructed Sanders that he could wait to object, or that it would hear the motion to suppress after admission of evidence, Sanders' arguments and ruling on his motion to suppress were untimely." *Id.* at 687.

Relying on *Sanders*, the First Court of Appeals also held that appellant failed to preserve the denial of his motion to suppress. However, in this case, the trial court heard argument on the motion and indicated that it would reserve its ruling until a later time:

Okay. I'm not going to have this discussion before we get this jury, because I'm not going to make a quick decision. I may side with you,

6

but based on what I have before me now I can't make this decision now.

My guess is that both of you want to talk to 'em about blood draws?

(RR II 14; Appendix B).

After the toxicologist testified to appellant's blood-alcohol concentration, the trial court denied appellant's motion to suppress. (RR 248; Appendix C).

The purpose of requiring that a defendant make a timely and specific objection in order to preserve an argument for appeal is to provide the trial court with the opportunity to rule on the objection and correct any error at the trial level. Appellant filed a motion to suppress the blood draw, brought it to the court's attention, and requested a ruling. Instead, the court indicated that it would reserve its ruling until a later time. Thus, the appellate court erred in relying on the holding in *Sanders* in ruling that appellant failed to preserve his complaint for review.

**Was *Missouri v. McNeely* the "state of the law in effect" when the defendant was tried? If so, did the First Court of Appeals err when it refused to find trial counsel ineffective for failing to challenge the constitutionality of Texas' implied consent statute?**

Appellant alleged that trial counsel was ineffective for failing to challenge the constitutionality of §§ 724.011 and 724.014 of the Texas Transportation Code in light of the ruling in *Missouri v. McNeely*. The First Court of Appeals noted that Texas jurisprudence did not declare that Texas' implied consent statute did not comport with a knowing and voluntary waiver, as required by the Fourth Amendment, until after appellant's trial. *Campuzano*, 2015 WL 1468304, at *8. As such, it held that

7

counsel's performance did not fall below an objective standard of reasonableness because counsel's performance must be "'measured against the state of the law in effect during the time of trial and we will not find counsel ineffective where the claimed error is based upon unsettled law.'" *Id.* (quoting *Ex parte Chandler*, 182 S.W.3d 350, 359 (Tex. Crim. App. 2005))

The appellate court failed to account that the state of the law at the time of appellant's trial was *McNeely*, and not subsequent state court rulings that adopted the principles announced in the Supreme Court decision. When deciding cases involving the United States Constitution, Texas courts are bound by United States Supreme Court case law interpreting it. *State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998). *McNeely* was decided six months prior to appellant's trial. Thus, it was the state of the law at the time of the trial.

*McNeely's* prohibition on *per se*, categorical exceptions to the Fourth Amendment's warrant requirement did not apply only to the exigency exception, but also included state's implied consent statutes. *See, e.g. Weems v. State*, 434 S.W.3d 655, 664 (Tex. App.--San Antonio 2014, pet. granted); *Gore v. State*, 451 S.W.3d 182, 193 (Tex. App.--Houston [1st Dist.] 2014, pet. filed). Texas' implied consent statute allows the State to ignore the Fourth Amendment's requirement of a warrant, as well as the totality of the circumstances test to justify exigency that was mandated by *McNeely*.

8

The "state of the law in effect" at the time of appellant's trial, as evidenced in *McNeely*, was that Texas' implied consent statutes do not provide a *per se* exception to the warrant requirement. The appellate court erred in determining that trial counsel could not have been ineffective because the law at the time of his trial differed.

## CONCLUSION

It is respectfully requested that this petition be granted, the First Court of Appeals' judgment be reversed, and the court ordered to enter findings consistent with this Court's opinion.

/s/ Mandy Miller
MANDY MILLER
Attorney for Jose Franco Campuzano
2910 Commercial Center Blvd., Ste. 103-201
Katy, TX 77494
SBN 24055561
(832) 900-9884
FAX (877) 904-6846

## CERTIFICATE OF COMPLIANCE

In accordance with the Texas Rules of Appellate Procedure, I hereby certify that appellant's petition for discretionary review, filed on June 1, 2015, has 3,075 words based upon a word count under MS Word.

/s/ Mandy Miller
MANDY MILLER
Attorney for Jose Franco Campuzano
2910 Commercial Center Blvd., Ste. 103-201
Katy, TX 77494
SBN 24055561
(832) 900-9884
FAX (877) 904-6846

## CERTIFICATE OF SERVICE

Appellant has sent a copy of the foregoing instrument to counsel for the State of Texas at the following electronic mail addresses:

Melissa Hervey
Harris County Assistant District Attorney
hervey_melissa@dao.hctx.net

Lisa McMinn
State Prosecuting Attorney
lisa.mcminn@spa.state.tx.us

/s/ Mandy Miller
MANDY MILLER
Attorney for Jose Franco Campuzano
2910 Commercial Center Blvd., Ste. 103-201
Katy, TX 77494
SBN 24055561
(832) 900-9884
FAX (877) 904-6846

10

# Appendix A

Opinion issued March 26, 2015



In The

# Court of Appeals

For The

# First District of Texas

---

NO. 01-13-00990-CR
NO. 01-13-00991-CR

---

**JOSE FRANCO CAMPUZANO, Appellant**

V.

**THE STATE OF TEXAS, Appellee**

---

On Appeal from the 176th District Court
Harris County, Texas
Trial Court Case Nos. 1315239 and 1315240

## MEMORANDUM OPINION

A jury found appellant, Jose Franco Campuzano, guilty of the offenses of intoxication manslaughter[1] and intoxication assault,[2] and it found that he used a deadly weapon, namely, a motor vehicle, in the commission of each offense. For the offense of intoxication manslaughter, the jury assessed appellant's punishment at confinement for fifteen years. For the offense of intoxication assault, the jury assessed his punishment at confinement for five years, suspended the sentence, and placed him on community supervision for five years. And the trial court ordered that the sentences run consecutively. In three issues, appellant contends that his trial counsel provided him with ineffective assistance and the trial court erred in denying his motion to suppress his blood-alcohol test results and in cumulating his sentences.

We affirm.

## Background

Javier Macias, the complainant in the intoxication-assault case, testified that at approximately 3:00 p.m. on August 1, 2011, he went to visit appellant at his house, and they shared a "12-pack" of beer. Later that evening, appellant drove them to a nightclub in his father's red Ford F-150 pickup truck, stopping along the

---

[1] See TEX. PENAL CODE ANN. § 49.08 (Vernon 2011); trial court case number 1315239; appellate cause number 01-13-00990-CR.

[2] See TEX. PENAL CODE ANN. § 49.07; trial court case number 1315240; appellate cause number 01-13-00991-CR.

way to purchase a second case of beer. Macias, wearing a gray shirt, and appellant, wearing a "striped" shirt, arrived at the nightclub at around 9:00 p.m. and stayed until midnight. During that time, they each drank half of the second case of beer. At around midnight, appellant drove them to a second nightclub, where together they consumed "about 7" more beers. Over the course of the evening, Macias and appellant each consumed a total of "15 or 16 beers." When they left the second club at around 1:00 a.m., appellant drove, and Macias sat in the passenger seat, where he "passed out." The next thing that Macias remembered was "waking up in a hospital" with both of his legs broken.

Cesar Alamilla testified that on the night of August 1, 2011, he was at work at a business on Chrisman Road in Houston when a co-worker, Alejandro Perez, came in looking for a fire extinguisher and reported that there had been a traffic collision. Alamilla followed Perez outside, where he saw an F-150 truck and a white Ford Thunderbird "in the road crushed into each other." Alamilla tried to look inside the truck, but could not see because it was dark, the windows were rolled up, and there was "smoke inside." He noted that the truck was on fire and flames were spreading. While Perez tried to extinguish the fire, Alamilla called for emergency assistance. He then saw someone inside the truck, knocking on the passenger-side window and trying to "push out." Because the passenger door would not open, Perez broke the window with the fire extinguisher and helped the

3

man, whom Alamilla described as wearing a white shirt, out of the truck and "dragged him . . . off to the side" because the truck was still on fire. Another man was still in the truck, "a little bit farther in," "kind of laying in the back seat," and "passed out." Jordan Jimenez, another co-worker of Alamilla, reached in and "grabbed" the man, but "he was hanging on something." Alamilla then reached in with Jimenez, and, together, they extracted the second man, whom Alamilla described as wearing a "striped" shirt.

Harris County Sheriff's Office ("HCSO") Deputy J. Craig testified that after midnight on August 2, 2011, he was dispatched to a "major" collision on Chrisman Road. At the scene, Craig checked on the driver of the Thunderbird, Daniel Padilla, and found that he "had no pulse." Craig spoke with witnesses who said that they had pulled from the truck the two men, appellant and Macias, lying on the ground. When Craig bent down to determine whether appellant and Macias, both unconscious, were still breathing, he smelled alcohol on their breath. He noted that appellant was wearing a "plaid" shirt and missing a shoe.

HCSO Deputy M. Smith testified that he was dispatched to investigate the collision, which had occurred at around 2:00 a.m. on August 2, 2011. He explained that Chrisman Road is "an extremely dark," two-lane, rural road, with ditches on both sides and a 35 mile-per-hour speed limit. Smith noted that the last name of the registered owner of the red F-150 truck that had been involved in the

4

collision matched that of appellant, neither appellant nor Macias had been wearing a seatbeat, the firewall and floorboard of the truck were folded up into the passenger compartment, and a "green and white and black" left shoe with a "big number 24" on the side was embedded in the driver's-side floorboard. He also found a beer bottle in the truck and smelled the odor of alcohol emanating from appellant and Macias.

From his investigation and review of videotapes recorded by surveillance cameras in the area, and which were published to the jury, Smith opined that Padilla, the driver of the Thunderbird, had been traveling northbound on Chrisman Road and appellant, the driver of the truck, had been traveling southbound in the northbound lane. Appellant's truck collided with Padilla's Thunderbird almost "head on," the car and truck crushed and "[e]mbedded into each other," and they traveled "as one vehicle," spinning counterclockwise, for "approximately 50 feet," before coming to a stop and catching fire.

HCSO Deputy B.G. Wilbanks, an accident reconstruction specialist, opined, based on his investigation, that just before impact, Padilla's Thunderbird had been traveling at a speed of 43 miles per hour and appellant's truck had been traveling at 94 miles per hour.

HCSO Deputy P. Begley testified that Deputy Smith sent him to the separate hospitals to which appellant and Macias had been taken to further investigate. At

5

Memorial Hermann Hospital, he found appellant, lying unconscious and intubated, in the emergency room. He noted that appellant was wearing a plaid shirt, and in a bag at the foot of his bed was a "black, green, and white tennis shoe with the number 24 on the side of it." Because the shoe in the bag matched that shoe embedded in the driver's-side floorboard of the truck that had been involved in the collision, Begley contacted Smith, notified him of appellant's condition, and suggested that, "due to the circumstances of the wreck and all the totality of it, a blood draw was warranted." Begley explained that he did not obtain a search warrant for appellant's blood seizure because he obtained the blood specimen pursuant to the "implied consent" statute.[3]

Laura Neal, a charge nurse at Memorial Hermann Hospital, testified that while she was on duty on August 2, 2011, emergency personnel brought appellant in for treatment. At 3:05 a.m., she drew blood from appellant to assess his medical status, including any intoxication. Karen James, Director of Laboratory Services at the hospital, testified that a serum test revealed that appellant's blood-alcohol concentration was 0.285 milligrams per deciliter. A Memorial nurse, Ashley McVeigh, testified that at approximately 4:06 a.m., at Deputy Begley's request, she performed a "legal blood draw" on appellant. Dr. A. Kelly, a toxicologist at the Harris County Institute of Forensic Sciences ("HCIFS"), testified that a whole-

---

[3] *See* TEX. TRANSP. CODE ANN. §§ 724.011, .014 (Vernon 2011).

blood test revealed that appellant's blood-alcohol concentration was 0.21. And Dr. J. Waltershed of HCIFS opined, based on these results and on retrograde extrapolation, that appellant's blood alcohol concentration at the time of the collision was between 0.21 and 0.25, and "about 10 to 15 drinks were required for [appellant] to get to that level."

Appellant testified that earlier in the evening on the night of the collision, Macias had come to his house and offered him a single beer. Appellant drove them in his father's red truck to a nightclub, and they stopped along the way and purchased a "20-pack" of beer. Appellant admitted that during the course of the evening he had consumed half of "the 20 and a 12-pack more," which was "enough to be intoxicated," and he was driving the truck when he and Macias left the nightclub at around 1:00 a.m. He asserted, however, that they had stopped at a convenience store and switched seats. Appellant explained that because he felt intoxicated and needed to "sleep [it] off," he got into the passenger seat and "nodded off" while Macias was inside the convenience store, and Macias was driving the truck at the time of the collision.

## Motion to Suppress

In his first issue, appellant argues that the trial court erred in denying his motions to suppress "the blood draw taken by law enforcement" because "the State failed to carry its burden in proving the warrantless seizure of blood was

7

reasonable under the United States and Texas Constitutions." *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. He asserts that the State failed to establish the existence of exigent circumstances and "[could] not rely on the implied consent statutes" because he "was not under arrest."

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012); *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility, and it may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We generally consider only the evidence adduced at the suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

8

When, as here, the trial court does not make findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling, as long as those findings are supported by the record. *Ross*, 32 S.W.3d at 855. We will affirm the trial court's decision if it is correct under any theory of law applicable to the case. *Id.* at 855–56.

A blood draw conducted at the direction of a law enforcement officer is a search subject to the reasonableness requirement of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1834 (1966). A warrantless search of a person is unreasonable unless it falls within a recognized exception to the warrant requirement. *Missouri v. McNeely*, —U.S.—, 133 S. Ct. 1552, 1558 (2013). A warrantless seizure of a blood specimen may be constitutionally permissible if a law enforcement officer has probable cause to arrest, exigent circumstances exist, and a reasonable method of extraction is available. *Schmerber*, 384 U.S. at 767–68, 86 S. Ct. at 1834. Further, voluntary consent to search is among the recognized exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973); *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003).

In *Schmerber*, the United States Supreme Court upheld a warrantless blood draw for the offense of driving while intoxicated ("DWI"). 384 U.S. at 772, 86 S.

9

Ct. at 1836. The Court concluded that exigent circumstances were present because the defendant-driver and his companion had each sustained injuries, law enforcement officers had to use time to take the defendant to a hospital and to investigate the scene of the collision, and the delay necessary to obtain a warrant threatened the destruction of evidence because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* at 770–71, 86 S. Ct. at 1836.

In *McNeely*, the Court clarified that *Schmerber* did not create a per se exigency exempting blood-alcohol tests from the warrant requirement. 133 S. Ct. at 1556. Rather, the Court recognized that exigent circumstances, based in part on the rapid dissipation of alcohol in the body, may allow law enforcement to obtain a blood sample without a warrant. *Id.* at 1561. However, courts must determine on a case-by-case basis whether exigent circumstances exist, considering the totality of the circumstances. *Id.* The Court held that "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.*

In Texas, our "implied consent statute" provides in pertinent part that,

[i]f a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place, . . . while intoxicated, . . . the person is deemed to have consented, subject to this chapter, to submit to the taking of one

10

or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.

TEX. TRANSP. CODE ANN. § 724.011 (Vernon 2011). Such a person retains the right, subject to automatic suspension of his or her license, to refuse to provide a specimen. *Id.* § 724.013, .035. "A person who is dead, unconscious, or otherwise incapable of refusal is considered not to have withdrawn consent provided by section 724.011." *Id.* § 724.014(a). If, however, a person under arrest for DWI refuses to voluntarily submit to the taking of a specimen, and the person was the operator of a vehicle involved in an accident involving serious bodily injury or death as a result of the offense, or the officer has credible evidence that the person has been at least twice previously convicted of DWI, the officer "shall require the taking of a specimen of the person's breath or blood." *Id.* § 724.012(b) (the "mandatory statute").

The Texas Court of Criminal Appeals has recently held that the "provisions of the Transportation Code, do not, taken by themselves, form a constitutionally valid alternative to the Fourth Amendment warrant requirement." *State v. Villarreal*, —S.W.3d—, No. PD–0306–14, 2014 WL 6734178, at *20 (Tex. Crim. App. Nov. 26, 2014) (noting dispute before it "center[ed] on whether a warrantless, nonconsensual search of a DWI suspect's blood conducted pursuant to Section 724.012(b) complies with the Constitution"); *see Gore v. State*, 451 S.W.3d 182,

11

193 (Tex. App.—Houston [1st Dist.] 2014, pet. filed) (holding "implied consent that cannot be withdrawn does not meet the requirements for voluntary consent under the Fourth Amendment").

Here, in his supplemental motions to suppress his blood-alcohol test result, appellant asserted that his blood specimen was obtained pursuant to the "mandatory statute," in violation of his constitutional and statutory rights, as follows:

> At the hospital, an order was issued by deputies of the Harris County Sheriff's Department to hospital personnel, requiring that blood samples be drawn from [appellant], pursuant to Section 724.012 of the Texas Transportation Code.
>
> The blood samples, obtained in response to police instructions, were not drawn pursuant to a search warrant. No exigent or emergency conditions existed to excuse the need for obtaining a search warrant for the blood evidence. No known attempt was made by law enforcement personnel to obtain a search warrant.
>
> The United States Supreme Court, in *Missouri v. McNeely*, 569 U.S.____ (2013), has recently addressed warrantless drawing of blood in a DWI context, and its proscription thereof by the Fourth Amendment of the U.S. Constitution.
>
> The *McNeely* opinion holds that, absent exigent circumstances, a police officer must obtain a search warrant or [a defendant's] consent to obtain blood evidence. The opinion states that mere dissipation of alcohol from a defendant's bloodstream does not inherently constitute exigent circumstances. *Id.* . . . By implication, the provisions of the above Section 724.012 would constitute a per se procedure, and are unconstitutional.

During the hearing on appellant's motions, the following discussion took place:

12

[Appellant]: While we're here, can we address th[e] motion[s] to suppress on the warrantless blood draw?

[Trial court]: Yes.

[Appellant]: What I was suggesting to the [State] as far as to abbreviate this as much as possible, I think that if they—if we collectively can stipulate to the fact that blood was drawn without a warrant. We can stipulate to the contention that the policeman drawing the blood without a warrant based on the death pursuant to that implied consent statute.

[Trial court]: Sure.

[Appellant]: Which I think was 724 out of the Transp[ortation] Code, and then I think that he was also angling it to the fact that we had an unconscious defendant at that point. I think we could all stipulate to the existence of those facts. What we bring up then is that 724.012 was challenged and arguably stricken by [*Missouri v. McNeely*] . . . .

. . . .

[Trial court]: You think [*McNeely*] undoes the statutory basis for an automatic blood draw?

. . . .

[Appellant]: Arguably yes.

. . . .

[Trial court]: For a DWI.

[Appellant]: For a DWI, and taking them directly to a hospital and drawing the blood. It didn't appear to be any exigent circumstances. . . .

[Trial court]: Other than the dissipating blood pressure.

[Appellant]: Right, that was the only circumstances they were arguing was the exigent circumstance. The Supreme Court said, simply enough, that was not enough, but they said we are not going to—we do not want any bright line rules, and the State was seeking that to be a

13

per se standard. The Supreme Court rejects it, says . . . we're going to do this on a case by case review basis. It would be our contention that 724.012 becomes Texas' version of what a—what Texas thinks is a bright line rule, but there are portions of 724.012 that really are no different than what was going on in [*McNeely*]. . . .

[Trial court]: Right. But in this situation we have a person deceased and then as a result the police do a mandatory blood draw; is that right?

[State]: No. Technically we do not—we believe we could have done a mandatory blood draw, but the way that we're arguing it is as an implied consent blood draw, that he wasn't able to give or revoke consent— technically he wasn't able to revoke consent because he'd already given it as a part of the driving on the roads in Texas. So we took the draw based on implied consent purposes and for exigency circumstances. So not technically as a mandatory draw would have been done because we couldn't even get DIC's and all the refusals and the THP 51 and everything that is required for a mandatory sample.

[Trial court]: All right. Well—

[Appellant]: Absent a showing of some reason, I think [*McNeely*] says they still have to have a—

[State]: Well, let me—[*McNeely*] very clearly says, look, exigency has to be reviewed on a totality of the circumstances. . . . [*McNeely*] does not speak to mandatories. It does not speak to implied consent. It doesn't speak to anything that we've got here, other than exigency factors . . . .

[Trial court]: Okay. *I'm not going to have this discussion before we get this jury, because I'm not going to make a quick decision. I may side with you, but based on what I have before me now I can't make this decision now.* My guess is that both of you want to talk to 'em about blood draws?

14

| [Appellant]: | Well, I'm assuming at some point when she[] makes an opening statement she's going to want to get right into it. |
|---|---|
| [Trial court]: | Right. So I guess we cut the jury loose right after we pick 'em and we argue it. |

(Emphasis added.) The record does not reveal, however, that further discussion took place on this point.

Instead, after Dr. Kelly, the HCIFS toxicologist, testified in front of the jury that appellant's blood-alcohol concentration, at the time of the collision, was 0.21, the trial court admitted into evidence the toxicology report, stating the same, and published it to the jury. And after the trial court had released the jury for the day, it denied appellant's motions to suppress, as follows:

| [Trial court]: | Okay. I have reviewed the Defense's motion[s] to suppress, and their first supplement[s] to the motion[s] to suppress. [Defense counsel], do you have anything additional that you'd like to add? |
|---|---|
| [Appellant]: | No, your Honor. I think we basically have covered it in the evidence. I don't have anything significant to add. |
| [Trial court]: | All right. Then based on my listening to the evidence and reviewing your motion, your motion to suppress is denied on that basis, of [McNeely] and the implied consent section. |
| [Appellant]: | I understand. Note our exception. |

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a). Further, the trial court must have ruled on

15

the request, objection, or motion, either expressly or implicitly, or refused to rule and the complaining party must have objected to the refusal. *Id.* "A ruling made on a motion to suppress after an officer has testified about the facts sought to be suppressed in front of a jury does not preserve error since the ruling is untimely obtained." *Sanders v. State*, 387 S.W.3d 680, 686 (Tex. App.—Texarkana 2012, pet. struck).

Because appellant did not obtain a ruling on his motions to suppress his blood-alcohol test result until after Dr. Kelly had already testified to that result and the trial court had already admitted into evidence the toxicology report reflecting the result and published it to the jury, appellant did not preserve error. *See Trung The Luu v. State*, 440 S.W.3d 123, 128 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding error not preserved when trial court did not rule on motion to suppress until after evidence admitted without objection); *Thomas v. State*, 884 S.W.3d 215, 216–17 (Tex. App.—El Paso 1994, pet. ref'd). Further, appellant did not object to Kelly's testimony regarding his blood-alcohol test result or the admission into evidence of the toxicology report and its publication to the jury. *See Ratliff v. State*, 320 S.W.3d 857, 861–62 (Tex. App.—Fort Worth 2010, pet ref'd) (holding error not preserved where defendant did not obtain ruling on motion to suppress or object when testimony regarding evidence at issue presented to jury). Even if we were to assume that the trial court actually refused to rule on

16

his motions to suppress, appellant did not object to any such refusal, and, thus, no error is preserved. *See* TEX. R. APP. P. 33.1(a) (requiring objection to refusal to rule). Accordingly, we hold that appellant has not preserved his first issue for our review.

We overrule appellant's first issue.

### Ineffective Assistance of Counsel

In his second issue, appellant argues that his trial counsel provided ineffective assistance because counsel "failed to challenge the constitutionality" of Transportation Code sections 724.011 and 724.014 in light of *McNeely*. *See* —U.S.—, 133 S. Ct. 1552.

To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's

performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). However, if "no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

Here, there is no evidence in the record before us concerning whether appellant's trial counsel considered challenging the constitutionality of sections 724.011 and 724.014 and, if so, the reasons counsel chose not to do so. Appellant asserts that, although the record is silent regarding his counsels' reasoning for not challenging the constitutionality of these statutes, "there is no reasonable trial strategy for failing to do so, especially considering that counsel was relying on *McNeely* in an attempt to suppress the blood draw."

18

In his brief, appellant concedes that "*McNeely* may not have specifically addressed whether implied consent survives its decision." He asserts, however, that two post-*McNeely* cases "evidence that the issue is ripe for review." In *Reeder v. State*, the Texarkana Court of Appeals noted that *McNeely* "casts grave doubt on" whether the validity of a warrantless blood draw can be upheld on implied consent law. 428 S.W.3d 924, 929 (Tex. App.—Texarkana 2014, pet. granted). And, in its original opinion in *Aviles v. State*, the San Antonio Court of Appeals concluded that the warrantless seizure of the defendant's blood under the "mandatory statute," section 724.012, did not violate his Fourth Amendment rights, and the Texas Court of Criminal Appeals refused his petition for review. 385 S.W.3d 110, 116 (Tex. App.—San Antonio 2012, pet. ref'd), *cert. granted*, 134 S. Ct. 902 (2014). The United States Supreme Court, however, granted certiorari, vacating the appellate court's judgment and remanding the matter for further consideration in light of *McNeely*. *Aviles v. Texas*, —U.S.—, 134 S. Ct. 902, 902 (2014); *see Aviles v. State*, 443 S.W.3d 291 (Tex. App.—San Antonio 2014, pet. filed) (op. on remand).

The instant record shows, however, that appellant was sentenced on October 15, 2013, and it was not until three months later, in January 2014, that *Reeder* was decided and the Supreme Court granted certiorari in *Aviles*. Counsel's performance must be "measured against the state of the law in effect during the

19

time of trial and we will not find counsel ineffective where the claimed error is based upon unsettled law." *Ex parte Chandler*, 182 S.W.3d 350, 359 (Tex. Crim. App. 2005). Appellant has not provided any authority existing at the time of trial in this case demonstrating that his trial counsels' representation of him was deficient based on settled legal principles. *See id.* Accordingly, we hold that appellant has not demonstrated that his trial counsels' performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Lopez*, 343 S.W.3d at 143–44.

We overrule appellant's second issue.

### Sentencing

In his third issue, appellant argues that the trial court erred in "ordering that [his] sentences run consecutively because a probated sentence cannot run consecutively with a term of prison." Appellant asks that "the order cumulating his sentences be stricken and the judgments be reformed to set aside the order."

We review a trial court's cumulation order for an abuse of discretion. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). An abuse of discretion generally will be found only if (1) the trial court imposes consecutive sentences when the law requires concurrent sentences, (2) the trial court imposes concurrent sentences when the law requires consecutive ones, or (3) the trial court otherwise fails to observe the statutory requirements pertaining to sentencing. *See*

20

*Nicholas v. State*, 56 S.W.3d 760, 764–65 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). An improper cumulation order is void, and the remedy is to reform the trial court's written judgment to delete the cumulation order. *Robbins v. State*, 914 S.W.2d 582, 584 (Tex. Crim. App. 1996); *LaPorte v. State*, 840 S.W.2d 412, 415 (Tex. Crim. App. 1992).

A trial court may order that sentences for two or more convictions be cumulated only as provided by statute. *Beedy v. State*, 194 S.W.3d 595, 597 (Tex. App.—Houston [1st Dist.] 2006), *aff'd*, 250 S.W.3d 107 (Tex. Crim. App. 2008). The Texas Code of Criminal Procedure generally authorizes a trial court to order consecutive sentences when a defendant is convicted in two or more cases, as follows:

> (a) When the same defendant has been convicted in two or more cases, judgment and sentence shall be pronounced in each case in the same manner as if there had been but one conviction. Except as provided by Sections (b) and (c) of this article, in the discretion of the court, the judgment in the second and subsequent convictions may either be that the sentence imposed or suspended shall begin when the judgment and the sentence imposed or suspended in the preceding conviction has ceased to operate, or that the sentence imposed or suspended shall run concurrently with the other case or cases, and sentence and execution shall be accordingly . . . .
>
> . . . .
>
> (c) If a defendant has been convicted in two or more cases and the court suspends the imposition of the sentence in one of the cases, the court may not order a sentence of confinement to commence on the completion of a suspended sentence for an offense.

21

TEX. CODE CRIM. PROC. ANN. art. 42.08 (Vernon Supp. 2014). "[T]he trial court's general authority under Article 42.08 to order consecutive sentences is statutorily limited by [Penal Code] Section 3.03." *LaPorte*, 840 S.W.2d at 415.

Section 3.03 provides in pertinent part as follows:

(a) When the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, a sentence for each offense for which he has been found guilty shall be pronounced. Except as provided by Subsection (b), the sentences shall run concurrently.

(b) If the accused is found guilty of more than one offense arising out of the same criminal episode, the sentences may run concurrently or consecutively if each sentence is for a conviction of:

(1) an offense:

(A) under Section 49.07 [intoxication assault] or 49.08 [intoxication manslaughter], regardless of whether the accused is convicted of violations of the same section more than once or is convicted of violations of both sections . . . .

TEX. PENAL CODE ANN. § 3.03 (Vernon Supp. 2014). Thus, when a defendant has been convicted of more than one offense arising out of the same criminal episode prosecuted in a consolidated trial, a trial court must order that the sentences run concurrently, unless the convictions involve certain offenses. *See id.* § 3.03(a). When, as here, a defendant is convicted of intoxication assault or intoxication manslaughter, the sentences may run concurrently or consecutively. *See id.* § 3.03(b)(1)(A).

Here, the jury assessed appellant's punishment at confinement for fifteen years for the offense of intoxication manslaughter. For the offense of intoxication

22

assault, the jury assessed his punishment at confinement for five years, suspended the sentence, and placed him on community supervision for five years. The trial court then ordered that the sentences run consecutively, with appellant serving his sentence of confinement first, followed by his period of community supervision.

Appellant concedes that the "charges of intoxication manslaughter and intoxication assault, although presented in two charging instruments, arose from the same criminal episode" and "[t]herefore, the cumulation of the punishments rendered is controlled by" section 3.03. He argues, however, that the trial court could not legally stack his community supervision on top of his sentence of confinement under section 3.03(b) because it only authorizes the cumulation of "sentences"; "community supervision is an arrangement in lieu of the sentence, not . . . part of the sentence"; and "community supervision is not governed by the rules of sentencing." *See Ex parte Williams*, 65 S.W.3d 656, 657 (Tex. Crim. App. 2001); *Speth v. State*, 6 S.W.3d 530, 532 (Tex. Crim. App. 1999). Appellant further argues that "because a term of community supervision is not a sentence unless the supervision is revoked and a term of prison or jail is assessed, it cannot be stacked on top of a prison term." *See McCullar v. State*, 676 S.W.2d 587, 588 (Tex. Crim. App. 1984). And he compares the use of the term "sentence" in section 3.03 with the terms "sentence imposed or suspended" in article 42.08.

23

In *Mireles v. State*, the Fourteenth Court of Appeals considered similar arguments. 444 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The court concluded that article 42.08 and section 3.03 are in pari materia, do not irreconcilably conflict, and may be harmonized. *Id.* at 682. It noted that it was "not aware of any cases since 1973, when Section 3.03 was first enacted, to . . . expressly hold that the statute does not apply to community supervision." *Id.* at 683. It reasoned that if section 3.03(b) does not encompass community supervision, then section 3.03(a) likewise would not, because both provisions refer to "sentences," without mentioning community supervision or sentences that are "suspended." *Id.* And if section 3.03 did not apply, then the trial court would be governed by the more general article 42.08, which grants it the discretion to order consecutive sentences. *Id.* at 684. The court concluded that, either under the plain terms of section 3.03(b) or article 42.08, the outcome was the same in that the trial court had the discretion to stack the sentences. *See id.*

Similarly, we hold here that the trial court did not err in ordering that appellant's sentences run consecutively, with appellant first serving his fifteen-year sentence of confinement, followed by his five-year period of community supervision.

We overrule appellant's third issue.

## Conclusion

We affirm the judgments of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Massengale.

Do not publish.   TEX. R. APP. P. 47.2(b).

# Appendix B

MS. BARD: There's no duty in any civil court, J.P. court, criminal court, or anything in between that you have a duty to perceive and evade an accident, whether you are sober or intoxicated, it doesn't exist.

THE COURT: All right. Please don't go into it with the panel, and I'll look at the standard and we'll fight it out, but I hate to do that while the jury's waiting out there.

MR. MITCHELL: I understand.

THE COURT: We don't want a hostile panel.

MR. MITCHELL: While we're here, can we address that motion to suppress on the warrantless blood draw?

THE COURT: Yes.

MR. MITCHELL: What I was suggesting to the DA's as far as to abbreviate this as much as possible, I think that if they -- if we collectively can stipulate to the fact that blood was drawn without a warrant. We can stipulate to the contention that the policeman drawing the blood without a warrant based on the death pursuant to that implied consent statute.

THE COURT: Sure.

MR. MITCHELL: Which I think was 724 out of the Transpiration Code, and then I think that he was also angling it to the fact that we had an unconscious defendant at that point. I think we could all stipulate to the existence of those facts.

What we bring up then is that 724.012 was challenged and arguably stricken by this McNealey versus Missouri case that just came out. Pardon me, it's backwards, it's Missouri versus McNealey.

MR. GALLAY: Back in April.

MR. MITCHELL: And we have a cite for that, just for the record.

THE COURT: You think McNealey undoes the statutory basis for an automatic blood draw?

MR. MITCHELL: There --

MR. GALLAY: Arguably yes.

MR. MITCHELL: The case involved in McNealey was simply a policeman arresting somebody.

THE COURT: For a DWI.

MR. MITCHELL: For a DWI, and taking them directly to a hospital and drawing the blood. It didn't appear to be any exigent circumstances. The State --

THE COURT: Other than the dissipating blood pressure.

MR. MITCHELL: Right, that was the only circumstances they were arguing was the exigent circumstance. The Supreme Court said, simply enough, that was not enough, but they said we are not going to -- we do not want any bright line rules, and the State was seeking that to be a per se standard. The Supreme Court rejects it, says no, that's not going to be the

case, we're going to do this on a case by case review basis.

It would be our contention that 724.012 becomes Texas' version of what a -- what Texas thinks is a bright line rule, but there are portions of 724.012 that really are no different than what was going on in McNealey. One of the provisions is that a multiple offender, a third time offender DWI defendant can have their blood drawn, and there's nothing exigent in that scenario at all.

THE COURT: Right. But in this situation we have a person deceased and then as a result the police do a mandatory blood draw; is that right?

MS. BARD: No. Technically we do not -- we believe we could have done a mandatory blood draw, but the way that we're arguing it is as an implied consent blood draw, that he wasn't able to give or revoke consent -- technically he wasn't able to revoke consent because he'd already given it as a part of the driving on the roads in Texas. So we took the draw based on implied consent purposes and for exigency circumstances. So not technically as a mandatory draw would have been done because we couldn't even get DIC's and all the refusals and the THP 51 and everything that is required for a mandatory sample.

THE COURT: All right. Well --

MR. MITCHELL: Absent a showing of some reason, I think McNealey says they still have to have a --

MS. BARD: Well, let me -- McNealey very clearly says, look, exigency has to be reviewed on a totality of the circumstances. We can't tell you one way or the other yes or no, but what we are going to tell you is that dissipation of alcohol alone and by itself is not enough. That's all McNealey says. McNealey, in fact, leaves open and says and leaves open within its opinion there are mandatory draws out there, and they're perfectly okay, and they use it to footnote and cite the reason why we don't want just dissipation alone as enough for an exigency.

McNealey does not speak to mandatories. It does not speak to implied consent. It doesn't speak to anything that we've got here, other than exigency factors like in Schmerber, the California exigency DWI case is still good law.

MR. GALLAY: Well, the Court goes on to talk about the increased communications and the accessibility of a warrant for an officer. They talk about Schmerber a lot in this case and they say in today's environment there's no reason why the officer couldn't have gotten a warrant.

MS. BARD: Incorrect.

THE COURT: Okay. I'm not going to have this discussion before we get this jury, because I'm not going to make a quick decision. I may side with you, but based on what I have before me now I can't make this decision now.

My guess is that both of you want to talk to 'em

about blood draws?

MR. MITCHELL: Well, I'm assuming at some point when she's makes an opening statement she's going to want to get right into it.

THE COURT: Right. So I guess we cut the jury loose right after we pick 'em and we argue it.

MS. BARD: Can I talk to him for one brief moment before we bring the jury, and I may be able to make this a little quicker. Can I have a moment?

THE COURT: You can have a moment. You-all seat the jury. I'm going to go in the back.

(Break.)

(Open court, defendant present.)

(Venirepersons in.)

VOIR DIRE EXAMINATION BY THE COURT

THE COURT: Good morning. You-all be seated.

("Good morning" in unison.)

THE COURT: Are you-all happy to finally be seated?

("Yes" in unison.)

THE COURT: How long have you-all been in the hallway?

VENIREPERSON: Too long.

VENIREPERSON: For a while, about an hour.

THE COURT: About an hour. All right. I heard a whole variety. I know that when you're standing out there it

# Appendix C

A. The technical reviewer in this case was Patricia Small.

Q. And what happens if she says, hey, I don't think you did this correctly, does that ever happen that often?

A. If something happens where she doesn't believe the protocol was followed exactly as it should have been, she'll let the analyst know and the test would be repeated.

Q. Did she do that in this case?

A. No, she did not.

Q. Did she sign off on your laboratory report?

A. Yes, she did.

MS. OSWALD: At this time I'd like to publish it to the jury, your Honor.

THE COURT: You may.

Q. (By Ms. Oswald) Now, what was the results of the lab, the lowest results of the two blood vials in this case?

A. It was 0.21 grams per 100 milliliters.

Q. And is this the lab reports that you submitted with regards to the two blood vials that were submitted to you on August 2, 2011?

A. Yes.

Q. And do we see here if we get closer, the name of the defendant right here?

A. Yes.

Q. And this is the number that was corresponded to the

lab vials when they came into your lab?

A. Yes.

Q. And is this your results right here?

A. Yes.

Q. And that -- that's for .21 grams per hundred milliliters of ethanol found in one of the blood vials?

A. Yes.

Q. Now, it was reviewed by two people. And who were those people here?

A. The technical reviewer was Patricia Small and the expert reviewer was Jeff Walterschied.

Q. So in the course of when these two blood vials got to the lab, you guys ensured that it was numbered correctly and corresponded to this defendant?

A. Yes.

Q. And then in addition you tested each blood vial twice, or the blood vials two times on separate days?

A. Yeah, that's correct.

Q. And then gave the lowest number as the result in the lab, right?

A. Yes.

Q. And in addition to you making sure that this was done correctly and protocols were followed, you had a technical reviewer in Patricia Small review it?

A. Yes.

Q.   As well as a toxicology expert to make sure these results were correct; is that right?

A.   Yes.

Q.   Now, are you aware of what the legal limit for driving is in Texas for ethanol in the blood?

A.   The ethanol legal limit is 0.08 grams per 100 milliliters.

Q.   And is a result of .21 higher than the legal limit?

A.   Yes, it is.

MS. OSWALD:   Pass the witness, your Honor.

THE COURT:   Cross-examination.

CROSS-EXAMINATION

BY MR. MITCHELL:

Q.   When you are dealing with the amount of the sample that you pulled out of your headspace --

A.   Yes.

Q.   -- I think you mentioned that it was a pretty small amount?

A.   Yeah.

Q.   And when you gave us a definition of grams per 100 milliliters, the amount that you pull out of that headspace in your aliquot is not anywhere near 100 milliliters, is it?

A.   No, it's not.

Q.   Do you know how much the multiplication of whatever your sample is, what is the multiplication factor to get it up

to our Penal Code rate of 100 milliliters?

A. We use 100 microliters. I believe it's a factor of a thousand.

Q. So for whatever an error may be, if there were an error, let me hypothetically assume there was an error, in any of the readings, not that you do but maybe within the instruments or the equipment that you're using, and effectively there could be a thousand times that error reproduced in order to translate this to grams per hundred milliliters, correct?

A. Well, we run a series of controls in order to ensure that everything is working.

MR. MITCHELL: Objection. That's not responsive.

THE COURT: Overruled.

A. Sorry.

Q. (By Mr. Mitchell) I understand you run a series of controls. The controls you run essentially are run in the performance of the same instrument that it's testing, correct?

A. Yes, that's correct.

Q. You don't do any independent testing on it other than run the controls through it, right?

A. Yes.

Q. The controls you run through are like premixed quantities of the alcohol and the propanol and various things that you run in as far as your controls, right?

A. Yes.

Q. And those things are things that -- those are also premanufactured when they come into your lab, right?

A. Yes, they are.

Q. And again, you don't know what quality controls were run by those manufacturers that provide those products to you, do you?

A. Well, we only purchase controls from manufacturers that are accredited.

Q. In any event, you still, within your standard procedures, that your office will still allow a 5 percent disparity between the test one day and the test the next day?

A. Yes.

Q. Again, whether it's a same tube or the second of the two tubes?

A. Yes.

Q. And obviously if they have -- if they -- that rule still holds true, by the way, if it's just one tube, correct?

A. Yes, it does, yes.

Q. So you expect as far as what you will tolerate is up to a 5 percent error just because it is what it is?

A. Yes.

MR. MITCHELL: I'll pass the witness, your Honor.

MS. OSWALD: No further questions, your Honor.

THE COURT: Thank you very much for coming in.

THE WITNESS: Thank you.

THE COURT: You-all ready now? Okay. Ladies and gentlemen, we will recess for the day. If you-all will please return tomorrow at 9:30, we'll start as promptly as we can get to you at 9:30. Thank you so much.

(Jury out.)

(Pause.)

THE COURT: Okay. I have reviewed the Defense's motion to suppress, and their first supplement to the motion to suppress. Mr. Mitchell, do you have anything additional that you'd like to add?

MR. MITCHELL: No, your Honor. I think we basically have covered it in the evidence. I don't have anything significant to add.

THE COURT: All right. Then based on my listening to the evidence and reviewing your motion, your motion to suppress is denied on that basis, of McNealey and the implied consent section.

MR. MITCHELL: I understand. Note our exception.

THE COURT: We will.

MR. MITCHELL: The only other thing, at some point I would like to make a proffer as to Deputy Smith's report and his phraseology in his report where he said that he was of the opinion that the decedent was intoxicated.

THE COURT: Why don't you read that into the record at this time.